UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

       v.

DAQUAN T. SMITH,

                        Defendant.
_____

REPORT & RECOMMENDATION

23-CR-6184FPG

## PRELIMINARY STATEMENT

By Order of Hon. Frank P. Geraci, Jr., United States District Judge, dated October 5, 2023, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 23).

On October 5, 2023, the grand jury returned an eight-count indictment against Daquan T. Smith ("Smith"). (Docket # 21). Counts One through Seven charge Smith with distribution of various Schedule I and II controlled substances, including fentanyl, cocaine, and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (*Id.* at 1-4). Count Eight charges Smith with possession of cocaine base with intent to distribute it, also in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (*Id.* at 4). Currently pending before the Court is Smith's motion to suppress tangible evidence seized during the execution of a search warrant at 215 Avenue C, Rochester, New York.[1] (Docket ## 28, 34, 41). For the reasons discussed below, I recommend that Smith's motion to suppress evidence be denied.

---

[1] In addition to the motions addressed herein, Smith also moved for other relief, including an audibility hearing, disclosure of *Brady* material, discovery, disclosures pursuant to Federal Rules of Evidence Rules 404(b),

**FACTUAL BACKGROUND**

I.     **The Search Warrant for 215 Avenue C**

On January 13, 2023, the Honorable Meredith Vacca ("Vacca"), Monroe County Court Judge, issued a warrant to search 215 Avenue C, Rochester New York.  (Docket # 30-1 at 4-7).  The warrant authorized a search for:

> Firearms, in violation of Section(s) 265.00 of the New York State Penal Law, and all ammunition, holsters, magazines, bullet clips, and firearm cleaning materials.  Also, any such evidence which tends to demonstrate that a weapons related offense was committed or that a particular person participated in the commission of such offense, to include written records, photographs, and books tending to show possession of firearms and indicia of residency.
>
> Proceeds and Records in violation of Section 220.00 of the New York State Penal Law, and all implements and paraphernalia used to prepare for sale, packaging and/or administer[ing] any heroin/fentanyl or cocaine in any form.  Also, any such evidence which tends to demonstrate that a drug related offense was committed or that a particular person participated in the commission of such offense, to include written records and books tending to show sale and trafficking of heroin/fentanyl and cocaine, and money showing profits from the sale of heroin/fentanyl and cocaine, pursuant to Section 690.10(4) of the New York State Criminal Procedure Law.  Also, records reflecting the names, addresses and telephone numbers of persons from whom heroin/fentanyl and cocaine is purchased and sold, including but not limited to, address and telephone books, cellular telephones and any data on said cellular telephones to include the retrieval of text messages, e-mail messages and voice mails, cameras, sd (memory) cards, photographs and video tapes which depict individuals involved in narcotic violations or identify heroin/fentanyl and cocaine traffickers and their associates; pursuant to Section 690.10(4) of the New York State Criminal Procedure Law.

---

608, and 609, identification of informants, production of *Jencks* material, preservation of rough notes, suppression of identification evidence, suppression of statements, leave to file additional motions, and expert disclosures. (Docket # 28).  Each of the motions was decided by the undersigned or resolved by the parties in open court on January 18, 2024.  (Docket ## 32, 33).

(*Id.* at 4-5).

> Additionally, the warrant authorized a search for:
>
> Cellular Telephone Devices *that belong to Daquan Smith or CJ* [2] and . . . the Contents of Cellular Telephone Devices for any information that tends to identify the owner/user of said cellular telephone devices, IMSI and MSN numbers associated with said cellular telephone devices, affixed to it within the battery compartment or accessible by disassembly of the phone or embedded in the memory of the phone or associated and attached SIM cards, any information regarding web connectivity including web searches and website history, and records kept electronically or digitally within the telephone's memory, to include: a log of recent incoming and outgoing calls, a list of contacts or phone book, any text messages, any e-mail messages, any pictures/picture messages, any videos/video-messages, any information gleaned from applications present on the phone such as social networking sites, any information relative to location information, and any information that tends to identify the user or subscriber of the phone, including telephone number, private ID number, and IP address.

(*Id.* at 6). The issuing judge inserted the italicized portion above into the warrant by hand; her initials appear next to the handwritten addition. (*Id.*). The warrant also authorized a search for other evidence, including records demonstrating indicia of residency, photographs and video tapes, electronic devices used for video or audio surveillance, and personal property tending to show the identity of any person owning, residing in, or controlling the premises. (*Id.* at 5-7). In addition to the warrant for 215 Avenue C, the issuing judge also signed warrants authorizing searches of 14 Laser Street and of Smith himself. (*Id.* at 1-2, 8-11).

The warrants were issued upon a supporting affidavit of Monroe County Sheriff's Office ("MCSO") Deputy Ryan Moore ("Moore"), sworn to on January 13, 2023. (*Id.* at 12-38). In his affidavit, Moore indicated that he was employed by the MCSO and had been assigned to

---

[2] Smith's girlfriend's full name is provided in the warrant. The Court will refer to her in this decision by her initials CJ.

the Monroe County Heroin Task Force and the Greater Rocester Area Narcotics Enforcement Team ("GRANET") for the previous five years. (*Id.* at 16). According to Moore, a fatal heroin/fentanyl overdose occurred on February 26, 2022, and a search of the overdose victim's cell phone revealed that on February 25, 2022, the victim had communicated with an unknown individual using the phone number (585) 485-2126 (the "target phone") in order to arrange a narcotics purchase. (*Id.* at 21-22). Further investigation revealed that the subscriber of the target phone was CJ, who shares a child with Smith. (*Id.* at 22).

In August 2022, Moore, in an undercover capacity, began texting with the target phone in an attempt to arrange a purchase of heroin/fentanyl. (*Id.* at 25). The individual using the target phone number instructed Moore to go to an area of Clinton Avenue in Rochester to conduct the transaction. (*Id.*). According to Moore, the identified location was "well known as an open air drug market" where "narcotics are openly bought and sold." (*Id.*). Moore traveled to the location and purchased fentanyl from an individual whom he "positively" identified as Smith.[3] (*Id.* at 25).

On September 6, 2022, Smith arrived at Rochester General Hospital with apparent gunshot wounds to both of his legs. (*Id.* at 26). He reported to officers that he had been sitting outside in front of 215 Avenue C when a car drove by and someone inside the vehicle shot him. (*Id.*). Smith reported that multiple people were in the car, but he was unable to identify the shooters because they were wearing masks. (*Id.*). Officers responded to the area and recovered two spent 9 mm casings near 198 Avenue C and observed blood in the street. (*Id.*).

Moore described several subsequent narcotics purchases he made from Smith. On September 16, 2022, Moore communicated with Smith via text message to the target phone.

---

[3] Moore's affidavit provided additional information about Smith, including that he was previously convicted for Criminal Possession of a Controlled Substance in the 7th Degree. (*Id.* at 23).

(*Id.*).  Smith informed Moore that he had been shot in both legs and that his "Baby Mama" would conduct the sale. (*Id.*).  Later that day, Moore arrived at the meeting location he had arranged with Smith, a parking lot on Clinton Avenue, and texted Smith on the target phone to advise Smith that he had arrived. (*Id.* at 27).  Approximately two minutes later, CJ approached and entered the passenger seat of the undercover vehicle. (*Id.*).  Moore gave CJ $150 in exchange for several bundles of fentanyl. (*Id.*).  According to Moore, members of the GRANET surveillance team followed CJ as she left the undercover vehicle on foot. (*Id.*).  The surveillance team observed CJ "eventually return[] to 215 Avenue C," where she checked the mailbox on the front porch and went inside. (*Id.*).

Moore made another controlled purchase from Smith on September 27, 2022. (*Id.* at 28).  On this occasion, Moore drove an undercover vehicle to 16 Laser Street and observed Smith exit a vehicle that was parked in the driveway of 14 Laser Street. (*Id.*).  Moore paid Smith $150 in exchange for thirty wax paper envelopes containing fentanyl. (*Id.*).

Approximately one month later, on October 25, 2022, Moore again purchased fentanyl from Smith. (*Id.* at 29-30).  As with the prior purchase, Moore drove his undercover vehicle to Laser Street. (*Id.* at 29).  Smith exited 14 Laser Street and entered the passenger seat of Moore's vehicle. (*Id.*).  Smith directed Moore to drive to the area of 1054 North Clinton Avenue. (*Id.*).  While they were driving, Moore and Smith discussed the injuries Smith had sustained during the shooting in front of 215 Avenue C. (*Id.*).  Smith told Moore that he possessed ".40 caliber and .380 caliber" handguns, which he described as "all he needed." (*Id.*).  Based upon Smith's comments, as well as another statement he made to Moore that he had used one of the two handguns he has to shoot at the vehicle in the September 2022 incident, Moore

believed that Smith possessed firearms "in furtherance of his ongoing dispute and his narcotics distribution operation." (*Id.* at 26, 29).

According to Moore, after they arrived in the area of 1054 Clinton Avenue, Smith got out of the car, walked to the rear of the building located at 1054 North Clinton Avenue, and returned to the car a few minutes later. (*Id.* at 29). Smith then handed Moore two bags of fentanyl in exchange for $240. (*Id.*). Moore drove Smith back to 14 Laser Street and observed him walk into the residence. (*Id.* at 29-30).

During the first week of December 2022, members of the surveillance team observed Smith enter and exit 215 Avenue C on several occasions. (*Id.* at 30). On the evening of December 28, 2022, Moore observed Smith enter the front porch door of 215 Avenue C at approximately 8:32 p.m. (*Id.*). Cell-site information from the target phone indicated that the phone was located in the area of 215 Avenue C throughout the night. (*Id.*).

The next day, at approximately 7:53 a.m., Moore arranged another purchase of narcotics from Smith. (*Id.* at 30-31). By text message from the target phone, Smith advised Moore to pick him up on Avenue B and drive him to the purchase location. (*Id.* at 31). Upon his arrival, Moore texted Smith to let him know he was there. (*Id.*). Cell-site location information for the target phone indicated that it was located in the approximate area of 215 Avenue C, and members of the surveillance team observed Smith exit the front door of that building and walk towards the back of the building. (*Id.*). A few seconds later, Moore observed Smith walking from the backyard of 215 Avenue C towards the undercover vehicle. (*Id.*).

Smith got into the car and instructed Moore to drive to the area of 1054 North Clinton Avenue. (*Id.*). When they arrived, Moore provided Smith $140, and Smith exited the vehicle and walked behind the building. (*Id.*). Members of the surveillance team observed an

6

apparent hand-to-hand transaction between Smith and an unknown individual. (*Id.*). Smith returned to the vehicle, asked Moore how he wanted the narcotics packaged, and walked back behind the building. (*Id.*). Smith then returned to the vehicle and gave Moore wax paper envelopes containing fentanyl. (*Id.*). Moore, unaccompanied by Smith, left in his vehicle. (*Id.*). Smith remained under surveillance and was observed returning by taxi to 215 Avenue C, where he entered the front door at approximately 8:26 a.m. (*Id.* at 31-32).

On January 13, 2023, Moore texted the target phone and made arrangements with Smith to purchase "eight-to-ten grams" of heroin or fentanyl. (*Id.* at 32). According to Moore, cell-site data associated with the target phone indicated that it was in the area of 215 Avenue C when their communications began. (*Id.*). During the text exchange, Smith requested that Moore rent a vehicle for Smith to use. (*Id.*). According to Moore's experience, drug traffickers commonly employ the tactic of using others to rent vehicles on their behalves to avoid creating records in their names. (*Id.*).

According to Moore's affirmation, Rochester Police Department records between 2019 and 2022 documented several domestic violence incidents involving CJ and Smith, each of which occurred at 215 Avenue C. (*Id.* at 22-23). Records from an incident on November 5, 2019, indicated that CJ resided at 215 Avenue C and listed Smith's address as 14 Laser Street. (*Id.* at 22). Records from a March 18, 2021 incident indicated that Smith resided at 14 Laser Street and that he used the target phone number. (*Id.* at 23).

According to Moore, investigators also reviewed cell-site data for the target phone number during the approximate two-month period between December 2022 and January 2023. (*Id.* at 33). The data reflected that the target phone was "routinely" located in the "direct area" of 215 Avenue C during overnight hours. (*Id.*). That data also indicated that the target phone was

sometimes located in the "direct area" of 14 Laser Street during nighttime hours. (*Id.*). According to Moore, 14 Laser Street is Smith's mother's residence. (*Id.*). Based upon the cell-site data and physical surveillance, Moore believed that 215 Avenue C was Smith's "primary residence where he spen[t] the majority of his evenings" during that two-month period; he believed that Smith spent the remainder at 14 Laser Street. (*Id.*).

In his affidavit, Moore summarized his investigative experience, including experience investigating illicit drug distribution networks. (*Id.* at 16-20). According to Moore, he has participated in hundreds of criminal investigations and numerous narcotics arrests. (*Id.*). Moore represented, based upon his training and experience, that drug traffickers often keep at their residence books and records relating to the manufacture, transportation, ordering, possession, sale, and distribution of narcotics. (*Id.*). In addition, drug traffickers commonly maintain contact information for their current and past narcotics associates. (*Id.*). According to Moore, drug dealers typically hide contraband proceeds of drug sales and records of drug transactions inside their residences, where they also commonly conceal drugs, currency, financial instruments, jewelry, and other valuable items. (*Id.*). In Moore's experience, drug dealers commonly possess ammunition and firearms, as well as paraphernalia for packaging, weighing, diluting, manufacturing, and distributing drugs. (*Id.*).

II. <u>**Smith's Affidavit**</u>

Smith submitted an affidavit in support of his motion to suppress.[4] (Docket # 41). His affidavit asserts that he had an expectation of privacy in the premises at 215 Avenue C on

---

[4] Smith's original motion papers sought suppression of the items seized from 215 Avenue C, as well as any evidence from the cell phone associated with the target phone number. (Docket # 28 at ¶ 45). It is not clear whether the cell phone was seized from Smith's person or found inside the premises. Smith's submission did not include an

8

January 17, 2023, the day the search warrant was executed. (*Id.* at ¶ 3). Smith maintains that 215 Avenue C is his residence and that he has lived there with his girlfriend, CJ, and their five children for the previous few years. (*Id.* at ¶ 4). According to Smith, the apartment is leased in CJ's name, and Smith has access to the entire apartment, including all of its rooms. (*Id.*).

## REPORT & RECOMMENDATION

**I.    Standing**

The government contests the adequacy of Smith's affidavit to establish his standing to challenge the search of 215 Avenue C. (Docket # 43). According to the government, Smith's statement that the apartment is his "residence" is too conclusory and his statement that he has lived there for a "few years" too vague to establish that he had a reasonable expectation of privacy in the premises searched. (*Id.*). I find that the affidavit is sufficient to entitle Smith to challenge the warrant.

In his affidavit, Smith represents that 215 Avenue C was his residence on the date the search warrant was executed and that he lived there with his girlfriend and their children. (Docket # 41 at ¶¶ 3-4). In addition, Smith affirms that he has resided in that apartment for the previous "few years" and that he has access to the entire apartment. (*Id.* at ¶ 4).

Although Smith has been incarcerated since his arrest on January 17, 2023, I find that Smith's representation that he has resided at 215 Avenue C for the previous "few years" sufficient to establish his standing to challenge the search of the apartment. *See, e.g.*, *United*

---

affidavit from Smith, and the Court gave him leave to submit one. (Docket ## 32, 33). On February 8, 2024, Smith submitted an affidavit. (Docket # 34). During proceedings before the Court on March 5, 2024, Smith's counsel confirmed that Smith did not intend to submit an affidavit establishing standing to challenge the seizure and search of the cell phone and was no longer challenging the seizure and search of the phone. (Docket # 38). During those proceedings, the Court permitted Smith further leave to submit a supplemental affidavit in support of his motion to suppress evidence seized from 215 Avenue C. (*Id.*). Smith filed that affidavit on April 1, 2024. (Docket # 41).

*States v. Taylor*, 1992 WL 249969, *9 (S.D.N.Y. 1992) ("[s]ince the government filed its brief, however, the defendant has submitted an affidavit stating that 6 Berkeley Avenue has been his residence since 1986[;] ... [defendant] has therefore made the necessary showing of a legitimate expectation of privacy[;] [a]ccordingly, the [c]ourt must consider [defendant's] arguments that the warrants were defective and determine whether there was probable cause to issue them"). Smith could reasonably expect that the Court, which is familiar with Smith's detention on the pending charges, would interpret his affidavit to mean that he had lived at that address for several years before his detention.

II.   **Validity of Search Warrant for 215 Avenue C**

Smith contends that Moore's affidavit is inadequate to establish probable cause for the warrant to search 215 Avenue C because it fails to allege facts demonstrating or even suggesting that evidence of Smith's alleged criminal conduct would be found in the apartment. (Docket # 28 at ¶¶ 35-46). The government disagrees and argues that, even if the warrant were not supported by probable cause, the evidence was seized in good faith reliance on its apparent validity. (Docket # 30 at 4-9).

Whether a search warrant satisfies the Fourth Amendment's probable cause requirement is judged under the familiar "totality of the circumstances" test. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her,] including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial

basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. at 238-39) (internal quotation omitted). Moreover, resolution of marginal cases should be determined by the preference to be afforded to warrants. *Id*. (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

"A defendant's status as a drug dealer alone does not give rise to a fair probability that evidence of drug trafficking will be found in his home." *United States v. Williams*, 350 F. Supp. 3d 261, 267 (W.D.N.Y. 2018). Rather, "[t]o establish probable cause to search a residence, two factual showings are necessary – first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Here, Smith does not argue that Moore's affidavit was insufficient to establish probable cause that Smith was involved in illegal narcotics sales. (*See* Docket # 28 at ¶ 40 ("[a]ssuming, *arguendo*, that the application supports probable cause that [Smith] was involved in criminal activity, specifically the selling of controlled substances, the inquiry is not complete"). Nor does Smith argue that the allegations in the affidavit were inadequate to connect him to the apartment at 215 Avenue C. Rather, he maintains that the warrant is invalid because Moore's affidavit failed to establish that "the items sought" would be found inside the premises at 215 Avenue C. (*Id.* at ¶ 41). According to Smith, the affidavit is devoid of any factual allegation that Smith "sold drugs from his residence, stored drugs at his residence, []or any other allegation that would support probable cause to search his residence." (*Id.*).

As an initial matter, the absence of any allegation that narcotics were sold from or observed inside 215 Avenue C does not automatically invalidate the warrant. *See United States v. Milner*, 2024 WL 811965, *3 (D. Conn. 2024) ("there is no requirement of direct observations

11

of drugs, drug records, drug proceeds or drug paraphernalia in the residence"); *United States v. Mouzon*, 2016 WL 7188150, * 5 (S.D.N.Y. 2016) ("[a] showing of nexus between the activities alleged and a suspect's residence does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience") (*quoting United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (brackets omitted)). Significantly, the warrant at issue did not authorize a search of the premises for narcotics. Rather, it authorized a search for, *inter alia*, records of narcotics sales, proceeds of such sales, firearms, and cell phones belonging to the defendant or his girlfriend. (Docket # 30-1 at 4-6). *See United States v. Funderburk*, 492 F. Supp. 2d 223, 252 (W.D.N.Y. 2007) ("because the challenged search warrant authorized the executing agents to search not only for quantities of cocaine, but also for books, notes, ledgers, and other documents and records . . . at [defendant's] residence[,] . . . the court finds the absence of any specific information connecting suspected drugs to [defendant's] residence . . . in the agent's supporting affidavit does not invalidate the search warrant").

In his affirmation, Moore explained his belief, based upon his experience as a GRANET officer, that individuals engaged in drug trafficking often retain in their residences records of their trafficking activities, including names, addresses, and contact information of narcotics-related associates, as well as notes or ledgers reflecting narcotics transactions. (Docket # 30-1 at 18-19 at ¶¶ 4(c) – 4(e)). "Probable cause determinations are frequently upheld in situations where a law enforcement officer provides an expert opinion that drug traffickers often maintain evidence of their crimes at their residences[,] . . . even in the absence of any specific information connecting suspected drugs to those premises." *United States v. Montgomery*, 2017 WL 3821262, *8 (W.D.N.Y. 2017) (internal quotations and brackets omitted); *United States v. Fernandes*, 50 F. Supp. 3d 398, 405 (W.D.N.Y. 2014) ("[i]t is well settled in this Circuit that an

12

agent's expert opinion that his experience taught him that major drug traffickers frequently maintain at their homes evidence of the crime is an important factor in determining whether probable cause exists") (internal quotations and brackets omitted); *United States v. Morgan*, 690 F. Supp. 2d 274, 287 (S.D.N.Y. 2010) ("[a]s the Second Circuit has recognized, a [g]overnment agent's expert opinion is an important factor to be considered by the judge when making a probable cause determination[,] [and] [t]his [c]ourt is entitled to rely on the agent's opinion, as well as the commonsense notion that an individual engaged in a conspiracy may have evidence of that conspiracy, including telephone numbers and other contact information, located in his residence") (internal quotation omitted).

Although such an opinion, where unaccompanied by any other evidence, may not suffice to establish probable cause, especially where the suspect is not alleged to be a large-scale trafficker, *see United States v. Williams*, 350 F. Supp. 3d at 268 ("where there is a lack of evidence directly connecting a residence to drug trafficking activity, information that the drug trafficking perpetrated by the defendant is large-scale in nature can support a probable cause finding to search the defendant's residence[;] . . . an investigator's opinion [that drug traffickers maintain evidence of their illegal activities at their residences] . . . is [generally] based on background evidence of significant, on-going drug trafficking activity"), Moore's affidavit includes additional allegations connecting Smith's illegal conduct with the apartment.

Specifically, Moore's affidavit describes two occasions on which the individual who sold the narcotics to Moore entered 215 Avenue C following the controlled purchase. *United States v. Stewart*, 2019 WL 2052136, *4 (D. Conn. 2019) ("[p]robable cause to search a location for contraband following a sale of narcotics may be established by observations of the seller going to the location immediately before or after the sale"). The first occurred on

September 16, 2022, when Smith's girlfriend, CJ, eventually returned to 215 Avenue C after selling Moore fentanyl during a meeting arranged by Smith. (Docket # 30-1 at 27).

The second occurred on December 28, 2022 – approximately two weeks before the search warrant was issued – when Smith was observed leaving the apartment before the controlled purchase and returning to that location immediately after the transaction. (*Id.* at 30-32). Smith counters that the surveillance observations on that day actually undercut any suggestion that he kept narcotics at 215 Avenue C; I agree that the factual allegations strongly suggest that Smith obtained the narcotics that he sold to Moore from someone on Clinton Avenue. (Docket # 28 at ¶ 42). That the drugs themselves may not have been stored inside the apartment, however, does not mean that *evidence of narcotics trafficking* would not be located inside the apartment. (As noted *supra*, the warrant did not authorize a search for controlled substances.) Indeed, according to Moore, cell-site data revealed that Smith was likely present at the apartment when they arranged the sale, and Smith traveled from the apartment to conduct the transaction and returned to the apartment after the transaction was completed; on these facts, it is certainly reasonable to expect that Smith returned to the apartment with the sale proceeds. *See United States v. Shaw*, 2023 WL 6873021, *2 (2d Cir. 2023) (summary order) (probable cause existed for warrant for defendant's residence where "[t]he affidavit described instances in which [defendant] traveled between his primary residence and other houses – believed to be 'stash' locations – after communicating with individuals to arrange drug transactions"); *United States v. Muhammad*, 520 F. App'x 31, 38 (2d Cir.) (summary order) ("[t]he short time between [defendant's] transactions . . . and his arrival at his . . . home provides a reasonable inference of a nexus between the drug purchases and his residence based on common sense") (internal quotations omitted), *cert. denied*, 571 U.S. 853 (2013); *United States v. Montgomery*, 2017 WL

3821262 at *9 (search warrant supported by probable cause; "[the] affidavit illustrates that [defendant] left [the premises] to travel to drug deals and returned to [the premises] immediately following drug deals[;] . . . [t]he logistical proximity of these drug deals to [the premises], considered with [the investigator's] 25 years of experience, provided a substantial basis . . . to conclude that there was a fair probability that investigators would find evidence of drug dealing in [the premises]").

Moreover, Moore alleged he arranged at least seven of the undercover purchases by contacting Smith over the target phone number. Geographic cell-site information associated with the target phone indicated that it was "routinely" located in the "direct area" of 215 Avenue C, including during overnight hours, during the two-month period preceding the issuance of the warrant. In fact, according to Moore, the cell-site data reflected that the target phone was "pinging in the direct area" of 215 Avenue C on January 13, 2023 – the day the warrant was issued – at the time that Smith was arranging a drug sale. These allegations certainly suggest a fair probability that law enforcement would find the target phone during the execution of the warrant. *United States v. Milner*, 2024 WL 811965 at *4 ("wholly apart from the likelihood that a search of the apartment would yield drugs proceeds, the affidavit provided a substantial basis for concluding that a search of the apartment would yield admissible evidence of the defendant's involvement in the controlled buys[;] [s]pecifcally, the affidavit established a fair probability that a search would yield the cell phone the defendant used to arrange the controlled buys").

Additionally, Moore's affirmation also established a fair probability that a search of 215 Avenue C, which Smith was using as a residence, would uncover the firearms (or firearms-related evidence, such as ammunition, holsters or cleaning materials) that Smith told Moore he possessed. According to the affidavit, Smith was shot outside 215 Avenue C in

15

September 2022, and he subsequently informed Moore that he possessed .40 and .380 caliber handguns. He also told Moore that he had used one of those handguns to return gunfire on the vehicle involved in the shooting incident. On this record, I find that the warrant for 215 Avenue C was supported by probable cause.[5]

In any event, even assuming that the probable cause determination could be considered a close case, application of the *Leon* doctrine defeats Smith's suppression motion. In short, nothing in the record suggests that the searching officers did not rely upon the search warrant in good faith.

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective. *Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000). The rationale underlying this good-faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *United States v. Leon*, 468 U.S. at 919. "Indeed, exclusion has always been our last resort, not our first impulse." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)), *cert. denied*, 565 U.S. 1236 (2012). The warrant here was not

---

[5] The government suggests that Smith has failed to sufficiently identify the evidence seized from 215 Avenue C that he seeks to suppress. (Docket # 30 at 5). To the contrary, Smith's motion seeks suppression of cocaine, suboxone strips, baggies and packaging materials, and a razor blade. (Docket # 28 at ¶ 36). The only basis for suppression asserted by Smith is that the warrant authorizing a search of 215 Avenue C was not based upon probable cause. Nothing in his motion papers suggests that Smith challenges the execution of the warrant or the scope of the search. In any event, as set forth above, probable cause supported the authorized search for, *inter alia*, drug records and proceeds and cell phones and memory cards (Docket # 30-1 at 4-7), items sufficiently small in size that it is reasonable to believe that the officers would have lawfully uncovered the seized controlled substances and drug paraphernalia.

so facially deficient or so lacking in probable cause that reliance upon it would have been objectively unreasonable. *See United States v. Muhammad*, 520 F. App'x at 39 ("[e]ven if the affidavit in support of the warrant had not established probable cause, the [d]istrict [c]ourt would not have erred in declining to suppress the evidence because the officers who obtained the warrant acted with objective good faith[;] . . . [f]or the same reasons we conclude that the affidavit provided probable cause, we conclude that the warrant application was not so lacking in indicia of probable cause as to render reliance upon it unreasonable") (internal quotations omitted); *United States v. Shaw*, 2023 WL 6873021 at *2 ("even were we to conclude that evidence was shy of satisfying the probable cause requirement, we would nonetheless rule that the search was lawfully conducted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate judge") (internal quotations omitted); *Williams*, 350 F. Supp. 3d at 276-77 (denying motion to suppress tangible evidence and concluding "that the *Leon* good faith exception applies without reaching the issue of whether probable cause supported issuance of the search warrant").

For all of the reasons explained above, it is my recommendation that Smith's motion to suppress evidence seized from 215 Avenue C be denied.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny Smith's motion to suppress tangible evidence. (Docket # 28).

    *s/Marian W. Payson*
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
       May 14, 2024

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(c) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(c)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                          *s/Marian W. Payson*
                          MARIAN W. PAYSON
                       United States Magistrate Judge

Dated: Rochester, New York
        May 14, 2024

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).